THE KNEAFSEY FIRM, INC.
SEAN M. KNEAFSEY (SBN 180863)
skneafsey@kneafseyfirm.com
800 Wilshire Blvd., Suite 710
Los Angeles, California 90017
Phone: (213) 892-1200
Fax: (213) 892-1208

Attorneys for Plaintiff
BRADLEY TWYNHAM

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRADLEY TWYNHAM , an individual<br><br>Plaintiff,<br><br>vs.<br><br>COMPUTER SCIENCES CORPORATION, a Nevada corporation, DXC TECHNOLOGY COMPANY, a Nevada corporation<br><br>Defendants. | Case No.:<br><br>**COMPLAINT FOR DAMAGES FOR:**<br><br>1. **BREACH OF CONTRACT**<br>2. **BREACH OF CONTRACT**<br>3. **VIOLATION OF CALIFORNIA LABOR CODE § 2802.**<br>4. **UNFAIR COMPETITION IN VIOLATION OF CAL. BUS. & PROF. CODE § 17200, ET SEQ.**<br><br>**[Demand for Jury Trial]** |

Plaintiff Bradley Twynham, for his complaint against Defendants Computer Sciences Corporation and DXC Technology Company states and alleges as follows:

## THE PARTIES

1. Plaintiff Bradley Twynham (hereinafter "Mr. Twynham") is a Australian national and permanent resident of Australia.

2.     Defendant Computer Sciences Corporation (hereinafter "CSC") is a Nevada corporation with principal place of business in Tysons Corner, Virginia.

3.     Upon information and belief, Defendant DXC Technology Company is a Nevada corporation with its principal place of business in Tysons Corner, Virginia. Upon information and belief, Defendant is a successor in interest to Defendant CSC, and has assumed CSC's liabilities to Plaintiff.

## JURISDICTION AND VENUE

4.     This is a civil action seeking damages for breach of contract, violation of California Labor Code § 2802, and violation of California Business and Professions Code § 17200, et seq.

5.     Federal diversity jurisdiction exists pursuant to 28 U.S.C. § 1332(a)(2) because the plaintiff is an alien subject of a foreign state and the defendants are citizens of different states, and because the value of the matter in controversy exceeds $75,000.

6.     This court has personal jurisdiction over the defendants in this matter because Defendants have had sufficient minimum contacts, including, but not limited to, because a substantial part of the events or omissions on which these claims are based occurred in Los Angeles County, California, including but not limited to, the fact that Plaintiff was employed by CBC here.

7.     Venue in this district is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions on which these claims are based occurred in Los Angeles County, California, including but not limited to, the fact that Plaintiff was employed by CBC here.

COMPLAINT

# BACKGROUND

A.    **Mr. Twynham's Employment with Computer Sciences Corporation ("CSC").**

8.    Mr. Twynham was employed by Servicemesh, Inc. from February 2009 to November 13, 2013 as a consultant and eventually Vice President of Emerging Markets.

9.    Mr. Twynham was the interim Vice President of Global Sales from January 2012 through July 2012, while the position was not filled.

10.    Mr. Twynham traveled to Santa Monica, California every two to three weeks at the direction of the company.

11.    In September 2013 to November 2013, Mr. Twynham was employed full time in Santa Monica, California.

12.    As the Vice President of Emerging Markets, Mr. Twynham's job duties included attempting to introduce Servicemesh's cloud management software into new vertical markets and territories which he succeeding in doing in new areas such as Europe.  Mr. Twynham was also in charge of Commonwealth Bank of Australia accounts.

13.    Due to CSC's purchase of Servicemesh's outstanding stock on or about October 29, 2013, discussed below, Mr. Twynham was hired by CSC as "Senior Principal: Complex Deals" on November 13, 2013.

14.    As the Senior Principal of Complex Deals, Mr. Twynham began focusing on larger deals between CSC and Commonwealth Bank of Australia.

15.    In March 2014, Mr. Twynham was transferred to CSC's United States office, working out of Servicemesh's Santa Monica office.

16.    Upon relocating to Servicemesh's Santa Monica office his role changed to "Senior Principal: Industry Strategist" and he began to focus more on how to evolve CSC's service lines.

COMPLAINT

**B.   Mr. Twynham's RSU Agreements with CSC**

17.   Mr. Twynham is a party to two agreements with CSC wherein he was awarded 19,575 and 199 Restricted Share Units ("RSUs"), respectfully.  (Exhibits 1 and 2).

18.   Pursuant to the first agreement dated November 15, 2013, Mr. Twynahm was awarded 19,575 Restricted Share Units ("RSUs").  These RSUs vested in thirds each year following the anniversary date of the agreement.

19.   Pursuant to the second agreement dated May 16, 2014, Mr. Twynham was to receive an additional 199 RSUs.

20.   Mr. Twyham received the first third of his RSUs under the November 15, 2013, agreement.  However, he did not receive the remaining two thirds of these shares which totals 13,050 RSUs.  In addition, Mr. Twynham did not receive any of the 199 RSUs.  As a result, the total RSUs at issue are 13,249.

**C.   The Equity Purchase Agreement Between CSC and Servicemesh.**

21.   On or about October 29, 2013, CSC, Servicemesh, The Equityholders of Servicemesh Inc., and Shareholder Representative Services LLC as the Equityholders' Representative entered into an "Equity Purchase Agreement" wherein CSC purchased all "Equity Securities of the Company."

22.   The Equity Purchase Agreement was amended on November 15, 2013.

23.   Mr. Twynham was not involved in the negotiation of this Equity Purchase Agreement.

24.   In addition to a cash payment, employee bonuses, and company stock options paid and transferred by CSC, the amended Equity Purchase Agreement called for a variable incentive "Earnout Payment Amount" based on Servicemesh's revenues between January 1, 2013 and January 31, 2014.  Therefore, the cutoff date of the earnout period was approximately three months after the Equity Purchase Agreement was first entered into.  For this Earnout Payment Amount, shareholders were to receive approximately $10.15 for every $1 in revenue generated in excess of

- 4 -

$20 million during the earnout period, with a maximum of about $137 million. After the earnout period, in February 2014, CSC calculated $29.7 million in revenue creditable to the Earnout Payment Amount, which resulted in $9.7 million in excess of the $20 million floor.  Therefore, shareholders were to be paid $98 million for the Earnout Payment Amount.

25.     Of the $29.7 million earned during the earnout period, approximately $10.4 million of the revenue was attributable to deals with Commonwealth Bank of Australia.

**C.     The Servicemesh-McAfee Contract with Commonwealth Bank of Australia.**

26.     During the earnout period, from about October 2013 to December 23, 2013, Mr. Twynham negotiated a deal pursuant to which Commonwealth Bank of Australia purchased security technology products manufactured by McAfee, Inc. from Servicemesh.

27.     Unbeknownst to Mr. Twynham, on March 19, 2014, approximately $5.6 million was transferred from the exchange agent account, from which payments were made for the Equity Purchase Agreement, to Techadvisors LLC. Eric Pulier, founder and part owner of Servicemesh, was the sole signatory on the Techadvisors account.

28.     Between June 25, 2014 and September 19, 2014, also unbeknownst to Mr. Twynham, over $4.7 million was transferred from the Techadvisors account to an account in the name of Ace, Inc.  This account was controlled by an Andrew Goldstein, who was a longtime friend of Pulier.

29.     In addition, also unbeknowlst to Mr. Twynham, Jon Waldron and Keith Hunter (both IT executives at Commonwealth Bank of Australia) and Hans Gyllstrom (IT consultant to Commonwealth Bank of Australia) subsequently allegedly received a total of $2,633,687 from the Ace account.

COMPLAINT

30.     In October 2014, Commonwealth Bank of Australia discovered that Waldron and Hunter received these funds from the Ace account and conducted an investigation.  They were both terminated.  Commonwealth Bank claimed that the value of the products and services provided by Servicemesh were inflated by approximately 65 percent.

31.     Several criminal investigations and civil lawsuits resulted thereafter requiring Mr. Twynham to incur substantial attorneys' fees due to his employment at Servicemesh and CSC.

**E.     United States of America v. Twynham Civil Forfeiture Lawsuit.**

32.     On September 2, 2015, the United States Attorney's Office in Los Angeles brought a civil forfeiture action against Mr. Twynham in the United States District Court, Central District of California titled *United States of America v. Real Property Located in Brentwood, California (Twynham) and $13,271.07 Seized From Premier America Credit Union Account Number XXXXXX5967*, Case No. CV 15-6794 RGK (AJWx) ("Forfeiture Action").

33.     The United States Attorney's Office claimed that Mr. Twynham purchased real property with a down payment, the majority of which was paid from funds the government alleged was traceable to the Equity Purchase Agreement payout.

34.     The government also seized the remaining cash that was left in Mr. Twynham's account, claiming they were likewise tainted notwithstanding the fact that he had no knowledge or involvement with the Pulier and other payments at issue.

35.     Mr. Twynham's attorneys filed a motion to dismiss and served discovery responses, and the matter was stayed due to the pending criminal investigation.  Mr. Twynham was unable to sustain the cost and risk of litigation and settled the matter for $413,158.37.  The Consent Judgment which resolved the case made clear that it may not be interpreted as an admission of wrongdoing.

- 6 -

### FIRST CAUSE OF ACTION
### BREACH OF CONTRACT
### (Against All Defendants)

36.     Plaintiff incorporates by reference the preceding allegations of the Complaint.

37.     Mr. Twynham and Defendants are parties to the Restricted Share Unit ("RSU") agreement attached as Exhibit 1.  Pursuant to this agreement, Mr. Twynahm was awarded 19,575 Restricted Share Units ("RSUs").  These RSUs vested in thirds each year following the anniversary date of the agreement.

38.     In breach of the agreement, Defendants failed to provide Plaintiff with 13,050 of the 19,575 RSUs to which he was entitled.

39.     Plaintiff substantially performed his obligations under the agreement.

40.     As a direct and proximate cause of Defendants breaches, Plaintiff will be damaged in an amount to be proven at trial.

### SECOND CAUSE OF ACTION
### BREACH OF CONTRACT
### (Against All Defendants)

41.     Plaintiff incorporates by reference the preceding allegations of the Complaint.

42.     Mr. Twynham and Defendants are parties to the Restricted Share Unit ("RSU") agreement attached as Exhibit 2.  Pursuant to this agreement, Mr. Twynahm was awarded 199 Restricted Share Units ("RSUs").

43.     In breach of the agreement, Defendants failed to provide Plaintiff with these RSUs.

44.     Plaintiff substantially performed his obligations under the agreement.

45.     As a direct and proximate cause of Defendants breaches, Plaintiff will be damaged in an amount to be proven at trial.

COMPLAINT

**THIRD CAUSE OF ACTION**
**VIOLATION OF CALIFORNIA LABOR CODE § 2802**
**(Against All Defendants)**

46.     Mr. Twynham repeats and realleges each of the allegations set forth above.

47.     At all times relevant to this Complaint, Mr. Twynham was an employee of Servicemesh, Inc. from February 2009 to November 13 2013, at which time it was purchased by CSC. Thereafter, Mr. Twynham was an employee of CSC from November 13, 2013 to July 1, 2015.

48.     Pursuant to California Labor Code Section 2802(a), "An employer shall indemnify his or her employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties, or of his or her obedience to the directions of the employer, even though unlawful, unless the employee, at the time of obeying the directions, believed them to be unlawful."

49.     California employers' obligation to defend and indemnify their employees is a serious one.  The California Supreme Court has explained:

> California has a strong public policy that favors the indemnification (and defense) of employees by their employers for claims and liabilities resulting from the employees' acts within the course and scope of their employment." (Chin et al., Cal. Practice Guide: Employment Litigation (The Rutter Group 2007) ¶ 3:1, p. 3-1 (rev. #1, 2007).) Labor Code section 2802 codifies this policy and gives an employee a right to indemnification from his or her employer. (See *Grissom v. Vons Companies*, Inc. (1991) 1 Cal.App.4th 52, 59-60 [1 Cal. Rptr. 2d 808] [the purpose of Lab. Code, § 2802 is "to protect employees from suffering expenses in direct

COMPLAINT

1    consequence of doing their jobs"]; *Janken v. GM Hughes*

2    *Electronics* (1996) 46 Cal.App.4th 55, 74, fn. 24 [53 Cal.

3    Rptr. 2d 741] [Lab. Code, § 2802 "shows a legislative

4    intent that duty-related losses ultimately fall on the

5    business enterprise, not on the individual employee"].)

6    *Edwards v. Arthur Anderson LLP*, 44 Cal. 4th 937, 957 (2008).

7         50.    In fact, it is illegal for any employer to attempt to obtain a waiver of

8    this obligation:

9    Labor Code section 2804 voids any agreement to waive

10   the protections of Labor Code section 2802 as against

11   public policy. Labor Code section 2804 provides, "Any

12   contract or agreement, express or implied, made by any

13   employee to waive the benefits of this article or any part

14   thereof, is null and void, and this article shall not deprive

15   any employee or his personal representative of any right

16   or remedy to which he is entitled under the laws of this

17   State." (Italics added.) (10) Courts have interpreted Labor

18   Code section 2804 to apply to Labor Code section 2802,

19   making all contracts that waive an employee's right to

20   indemnification null and void. (*See Liberio v. Vidal*

21   (1966) 240 Cal.App.2d 273, 276, fn. 1 [49 Cal. Rptr.

22   520].) Thus, indemnity rights are nonwaivable, and any

23   contract that does purport to waive an employee's

24   indemnity right would be contrary to the law and

25   therefore unlawful to that extent.

26   *Edwards v. Arthur Anderson LLP*, 44 Cal. 4th 937, 957 (2008).

27        51.    Mr. Twynham has incurred over one million dollars legal fees in

28   defense civil forfeiture lawsuit, the related investigations, and due to discovery

- 9 -

1   requests and a deposition request in the Delaware civil lawsuit filed by CSC.  These

2   were necessary expenditures incurred in direct consequence of the discharge of his

3   duties as the Senior Principal of Complex Deals of CSC and in obedience to the

4   directions of Servicemesh and CSC in its dealings with Commonwealth Bank of

5   Australia. The negotiation of the bank deals were not only within the scope of his

6   employment, but entailed the majority of his required and expected job duties.

7       52.   Also, Mr. Twynham's acts were not unlawful and he certainly did not

8   believe them to be unlawful.  The Consent Judgment of Forfeiture in the USA v.

9   Twynham civil forfeiture matter indicates, "Nothing in this consent judgment is

10  intended or should be interpreted as an admission of wrongdoing by Claimants

11  Bradley Martin Lewis Twynham or Mariel Twynham, nor can this consent judgment

12  be admissible in any criminal proceeding against the Claimants to prove any of the

13  facts relied upon to establish reasonable cause for the seizure of the defendant

14  assets."

15      53.   At all times relevant to this Complaint and in each of his interactions

16  with Servicemesh and CSC, Mr. Twynham was faithfully discharging his duties as

17  Vice President of Emerging Markets, Vice President of Global Sales, Senior

18  Principal: Complex Deals, or Senior Principal: Industry Strategist and following

19  Servicemesh and CSC procedures and guidelines.

20      54.   The inclusion of Mr. Twynham as a Defendant in *United States of*

21  *America v. Real Property Located in Brentwood, California (Twynham) and*

22  *$13,271.07 Seized From Premier America Credit Union Account Number*

23  *XXXXXX5967*, Case No. CV 15-6794 RGK (AJWx), as well as the initiation of

24  criminal investigations against Mr. Twynham, were a direct consequence of his

25  employment with Servicemesh and CSC.

26      55.   Under California Labor Code § 2802, Servicemesh and CSC are

27  responsible to defend and indemnify Mr. Twynham for all necessary expenditures or

28

- 10 -

losses incurred in defending himself in the aforementioned matters.  These
necessary expenditures or losses include attorney's fees.

56.     Wherefore, Mr. Twynham has been damaged in an amount to be
proven at trial.

## FOURTH CAUSE OF ACTION
### UNFAIR COMPEITION
### IN VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS CODE § 17200, ET SEQ.
### (Against All Defendants)

57.     The preceding paragraphs of this Complaint are re-alleged and
incorporated by reference as though fully set forth herein.

58.     By virtue of Defendants' aforementioned violations of the law,
Defendants have violated the Unfair Competition Law ("UCL"), under section
17200, et seq., of the California Business and Professions Code.

59.     Defendant retained funds necessary to the defense and settlement of
criminal actions brought against Mr. Twynham as a direct consequence of the
discharge of his duties as the Senior Principal of Complex Deals of CSC and in
obedience to the directions of Servicemesh and CSC.

60.     Defendant's act of retaining funds owed to Mr. Twynham for his
defense is an unlawful violation of California Labor Code § 2802 and, in the
alternative, unfair as Mr. Twynham endured financial loss in the discharge of his
duties to CSC.

61.     Under an equitable analysis of the facts of this case, Mr. Twynham's
right to indemnity for charges related to his service to CSC is analogous to his right
to the payment of his wages and constitutes equitable conversion.

62.     Plaintiff is therefore entitled to restitution in the amount of the value of
these sums in an amount to be proven at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays to this Honorable Court for the following relief:

1. For general and special damages as permitted by law;

2. For restitution;

3. For unjust enrichment;

4. Prejudgment interest to the extent allowed by law;

5. Attorney's fees and costs as otherwise allowed by law; and

6. For such other and further relief as the Court deems just and equitable.

DATED:  November 6, 2017      THE KNEAFSEY FIRM, INC.


                              */s/ Sean M. Kneafsey*
                        By  _____
                              Sean M. Kneafsey
                        Attorneys for Plaintiff BRADLEY TWYNHAM

COMPLAINT

**JURY TRIAL DEMAND**

Plaintiff hereby demands a trial by jury of any issue triable by right of a jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.

DATED:  November 6, 2017     THE KNEAFSEY FIRM, INC.


By _____*/s/ Sean M. Kneafsey*_____
Sean M. Kneafsey
Attorneys for Plaintiff BRADLEY TWYNHAM

COMPLAINT