THE KNEAFSEY FIRM, INC.
SEAN M. KNEAFSEY (SBN 180863)
skneafsey@kneafseyfirm.com
800 Wilshire Blvd., Suite 710
Los Angeles, California 90017
Phone:  (213) 892-1200
Fax:  (213) 892-1208

Attorneys for Plaintiff
BRADLEY TWYNHAM

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| BRADLEY TWYNHAM  an individual<br><br>Plaintiff,<br><br>vs.<br><br>COMPUTER SCIENCES CORPORATION, a Nevada corporation, DXC TECHNOLOGY COMPANY, a Nevada corporation; SERVICEMESH, INC., a Delaware corporation<br><br>Defendants. | Case No.: 2:17-cv-08107 SVW JEM<br><br>[Hon. Stephen V. Wilson]<br><br>**SECOND AMENDED COMPLAINT FOR DAMAGES FOR:**<br><br>1. **BREACH OF CONTRACT**<br>2. **VIOLATION OF CALIFORNIA LABOR CODE § 2802.**<br>3. **UNFAIR COMPETITION IN VIOLATION OF CAL. BUS. & PROF. CODE § 17200, ET SEQ.**<br><br>**[Demand for Jury Trial]** |

Plaintiff Bradley Twynham, for his complaint against Defendants Computer Sciences Corporation, DXC Technology Company, and Servicemesh, Inc., states and alleges as follows:

### THE PARTIES

1.     Plaintiff Bradley Twynham (hereinafter "Mr. Twynham") is an Australian national and permanent resident of Australia.

2.     Defendant Computer Sciences Corporation (hereinafter "CSC") is a Nevada corporation with principal place of business in Tysons Corner, Virginia.

3.     Upon information and belief, Defendant DXC Technology Company (hereinafter DXC") is a Nevada corporation with its principal place of business in Tysons Corner, Virginia. Upon information and belief, Defendant is a successor in interest to Defendant CSC, and has assumed CSC's liabilities to Plaintiff.

4.     Upon information and belief, Servicemesh, Inc., is a Delaware Corporation whose previous principal place of business was in Santa Monica California, until it was acquired by CSC pursuant to an agreement dated October 29, 2013.  Upon information and belief, Servicemesh was acquired in its entirety by CSC and after the acquisition Servicemesh ceased to engage in any meaningful business and exists only as a corporate shell.  Upon information and belief, Servicemesh keeps a nominal address at 3170 Falls Church, VA 22042.  Upon information and belief, upon CSC's acquisition, there was no material change in CSC's operation of Servicemesh's business.  For example, among other things, CSC operated from Servicemesh's location in Santa Monica, employed the same people, and performed under the same Servicemesh contracts.  Likewise, as discussed in more detail below, Mr. Twynham negotiated the same CBA Agreement both before, during, and after the acquisition (and while in the same Servicemesh/CSC office in Santa Monica).  In this regard, Mr. Twynham continued to negotiate the same contract terms, communicate with the same CBA representatives, and reported to the same Servicemesh/CSC employees.

## JURISDICTION AND VENUE

5.     This is a civil action seeking damages for breach of contract, violation of California Labor Code § 2802, and violation of California Business and Professions Code § 17200, et seq.

6.     Federal diversity jurisdiction exists pursuant to 28 U.S.C. § 1332(a)(2) because the plaintiff is an alien subject of a foreign state and the defendants are

- 2 -

1  citizens of different states, and because the value of the matter in controversy

2  exceeds $75,000.

3      7.     This court has personal jurisdiction over the defendants in this matter

4  because Defendants have had sufficient minimum contacts, including, but not

5  limited to, because a substantial part of the events or omissions on which these

6  claims are based occurred in Los Angeles County, California, including but not

7  limited to, the fact that Plaintiff was employed by Servicemesh and CSC here.

8      8.     Venue in this district is proper pursuant to 28 U.S.C. § 1391 because a

9  substantial part of the events or omissions on which these claims are based occurred

10  in Los Angeles County, California, including but not limited to, the fact that

11  Plaintiff was employed by CSC here.

12                          **BACKGROUND**

13  A.   **Mr. Twynham's Employment with Servicemesh and Computer**

14       **Sciences Corporation ("CSC").**

15      9.     Mr. Twynham was employed by Servicemesh, Inc. from February 2009

16  to November 13, 2013 as a consultant and eventually Vice President of Emerging

17  Markets.

18      10.    Mr. Twynham was the interim Vice President of Global Sales from

19  January 2012 through July 2012, while the position was not filled.

20      11.    Between July 2012 and September 2013, Mr. Twynham directly

21  reported to Jeff Drake who was physically located in Santa Monica, California, and

22  was a key Executive in Eric Pulier's Senior Leadership Team.  Mr. Twynham also

23  reported to Eric Pulier directly on all things related to the Commonwealth Bank of

24  Australia. Eric Pulier was also physically located in the Santa Monica Office of

25  Servicemesh (which became the Santa Monica Office of CSC in November of

26  2013).  In addition, Mr. Twynham spoke with Servicemesh personnel in the Santa

27  Monica office multiple times a day during that time period.  In addition, he was

28  required to, and did, travel to Santa Monica, California every two to three weeks at

1    the direction of the company.  While in Santa Monica approximately twice a month

2    during this time period, Mr. Twynham would physically work from the Santa

3    Monica Office where we would participate in meetings, initiate and receive phone

4    calls and emails.  Mr. Twynham had a physical office with a desk in Servicemesh'

5    Santa Monica office due to the large amount of time he spent in that office where we

6    would perform his work. Servicemesh also provided Mr. Twynham with a United

7    States mobile phone with a United States phone number due to the large amount of

8    work he was doing in California.  Twynham was also paid in United States dollars

9    due to the large amount of time he was in the United States.

10           12.    From September 2013 to November 2013, Mr. Twynham was

11   employed full time at Servicemesh's office Santa Monica, California, from which he

12   would perform the work described above, and which is discussed in more detailed

13   below.

14           13.    As the Vice President of Emerging Markets, Mr. Twynham's job duties

15   included attempting to introduce Servicemesh's cloud management software into

16   new vertical markets and territories which he succeeded in doing in new areas such

17   as Europe.  Mr. Twynham was also the senior executive sponsor of the

18   Commonwealth Bank of Australia account due to his history with the client and

19   relationships that had been developed due to his work with Servicemesh.

20           14.    Due to CSC's purchase of Servicemesh's outstanding stock on or about

21   October 29, 2013, discussed below, Mr. Twynham became the "Senior Principal:

22   Complex Deals" on or about November 13, 2013, and became a CSC employee at

23   that time.  Again, Mr. Twynham was physically working in CSC's Santa Monica

24   Office at that time.  Also at that time, CSC further requested that Mr. Twynham

25   work permanently in CSC's Santa Monica as soon as he could make arrangements

26   to do so.  Mr. Twynham agreed.  He subsequently temporarily returned to Australia

27   to make arrangements to move to Santa Monica with his family.  Still, during that

28   period of time, Mr. Twynham continued to speak with the Santa Monica Office

- 4 -

1   multiple times a day and to report directly to Mr. Pulier in the Santa Monica Office.

2   For example, Mr. Twynham began looking for a home in Los Angeles in November

3   of 2013 and engaged the services of a Los Angeles based real estate broker to do so.

4   In February of 2014, Mr. Twynham returned to the United States for the distinct

5   purpose of looking at homes arranged by that broker for a permanent place of

6   residence in Los Angeles.  In late February, 2014, Mr. Twynham placed a deposit on

7   a home in preparation for his permanent move to Los Angeles. Mr. Twynham was

8   also in constant contact with Mr. Drake and Mr. Pulier during that time for the

9   purposes of CBC's performance pursuant to the CBA Contract as well as working

10  on other United States based deals for the purposes of the earn-out and planning for

11  the integration of Servicemesh into CSC.

12       **B.     Mr. Twynham's RSU Agreements with CSC**

13       15.    Mr. Twynham is a party to an agreement with CSC, dated November

14  15, 2013, wherein he was awarded 19,575 Restricted Share Units ("RSUs"), a copy

15  of which is attached as Exhibit 1.  These RSUs vested in thirds each year following

16  the anniversary date of the agreement.

17       16.    As set forth above, Mr. Twynham was physically working in CSC's

18  Santa Monica Office on the date of this agreement.

19       17.    Mr. Twynham received the first third of his RSUs under the November

20  15, 2013, agreement.  However, he did not receive the remaining two thirds of these

21  shares which totals 13,050 RSUs.

22       **C.     The Equity Purchase Agreement Between CSC and Servicemesh.**

23       18.    On or about October 29, 2013, CSC, Servicemesh, The Equityholders

24  of Servicemesh Inc., and Shareholder Representative Services LLC as the

25  Equityholders' Representative entered into an "Equity Purchase Agreement"

26  wherein CSC purchased all "Equity Securities of the Company."  As a result, in

27  acquiring Servicemesh, CSC assumed all of Servicemesh's liabilities, including

28  Servicemesh's obligations to Mr. Twynham.

19.     Mr. Twynham was not involved in the negotiation of this Equity Purchase Agreement.

20.     In addition to a cash payment, employee bonuses, and company stock options paid and transferred by CSC, the amended Equity Purchase Agreement called for a variable incentive "Earnout Payment Amount" based on Servicemesh's revenues between January 1, 2013 and January 31, 2014.  Therefore, the cutoff date of the earnout period was approximately three months after the Equity Purchase Agreement was first entered into.  For this Earnout Payment Amount, shareholders were to receive approximately $10.15 for every $1 in revenue generated in excess of $20 million during the earnout period, with a maximum of about $137 million. After the earnout period, in February 2014, CSC calculated $29.7 million in revenue creditable to the Earnout Payment Amount, which resulted in $9.7 million in excess of the $20 million floor.  Therefore, shareholders were to be paid $98 million for the Earnout Payment Amount.

21.     Of the $29.7 million earned during the earnout period, approximately $10.4 million of the revenue was attributable to deals with Commonwealth Bank of Australia.

**C.     The Servicemesh-McAfee Contract with Commonwealth Bank of Australia.**

22.     During the period of time that Mr. Twynham was physically working from Servicemesh's Santa Monica Office between September 2013 and November 2013, Mr. Twynham was negotiating a deal pursuant to which Commonwealth Bank of Australia purchased security technology products manufactured by McAfee, Inc. from Servicemesh ("CBA Contract").  Mr. Twynham negotiated the CBA contract by, among other things, making phone calls while in the Santa Monica Office, sending and receiving emails while in the Santa Monica Office, and having face to face meetings in the Santa Monica Office with, among others, [1] his supervisor, Eric Pulier, [2] Servicemesh's product management team, and [3] Servicemesh's

- 6 -

Senior Executive Team, all who were based in Santa Monica and all who had roles in the negotiation of this deal during this period.  Mr. Twynham was required to provide daily reports to the Santa Monica office regarding the progress during this period of time when, again, he was physically working in his designated office in Santa Monica.

23.     In addition, Mr. Twynham was also involved with the performance of the CBA contract after it was executed, including after he moved permanently to California in March of 2014.  Mr. Twynham's involvement with the CBA Contract included making phone calls, sending emails, and participating in meetings all of which occurred in CSC's Santa Monica Office.  For example, between April and June 2015, Mr. Twynham worked to get a Technical Account Manager in place to service the contract as part of the CBA Contract's service conditions.  In addition, Mr. Twynham ensured that the CSC team members who were responsible for actively managing the CBA Account were doing so.  Mr. Twynham also met with CBA Executives in California on at least four occasions in 2014 under direction from Eric Pulier.

24.     Mr. Twynham's involvement with the CBA Contract in March of 2014 and forward required that he work closely with his supervisor, Eric Pulier.  In this regard, he regularly emailed, texted, and met with Mr. Pulier about matters pertaining to CSC's performance under the CBA Contract.  Mr. Twynham was regularly requested to attend to issues relating to that performance.  Mr. Twynham did all of this while working in CSC's Santa Monica Office.

25.     Unbeknownst to Mr. Twynham, on March 19, 2014, approximately $5.6 million was transferred from the exchange agent account, from which payments were made for the Equity Purchase Agreement, to Techadvisors LLC. Eric Pulier, founder and part owner of Servicemesh, was the sole signatory on the Techadvisors account.

SECOND AMENDED COMPLAINT

26.     Between June 25, 2014 and September 19, 2014, also unbeknownst to Mr. Twynham, over $4.7 million was transferred from the Techadvisors account to an account in the name of Ace, Inc. This account was controlled by an Andrew Goldstein, who was a longtime friend of Pulier.

27.     In addition, also unbeknownst to Mr. Twynham, Jon Waldron and Keith Hunter (both IT executives at Commonwealth Bank of Australia) and Hans Gyllstrom (IT consultant to Commonwealth Bank of Australia) subsequently allegedly received a total of $2,633,687 from the Ace account.

28.     In October 2014, Commonwealth Bank of Australia discovered that Waldron and Hunter received these funds from the Ace account and conducted an investigation. They were both terminated. Commonwealth Bank claimed that the value of the products and services provided by Servicemesh were inflated by approximately 65 percent.

29.     Notably, however, there is nothing alleged to be improper about the CBA contract itself. In fact, Twynham is informed and believes that the CBA Contract is still in effect and that CSC and CBA are still performing pursuant to it. The alleged impropriety has to do with the wrongdoing of Pulier and others set forth above and not the CBA Contract itself.

**D.     Twynham is Falsely Accused of Being Involved with Pulier's Wrongdoing Based On His Involvement With the CBA Contract, Both Before and After It Was Executed**

30.     Notwithstanding the fact that Mr. Twynham had no knowledge of Mr. Pulier's improper conduct, CSC falsely assumed that he did based on Mr. Twynham's involvement with the CBA Contract. This included not only his negotiation of the CBA Contract between September and November 2013 when he was physically working in CSC's Santa Monica office, but also, and perhaps more importantly, because Mr. Twynham continued to work for Mr. Pulier during the time that the improper payments were being made beginning in March of 2014

- 8 -

1  when Mr. Twynham was also working in the CSC Santa Monica Office and a

2  permanent resident of the State of California.

3       31.    In this regard, during the time that Mr. Twynham was a permanent

4  resident of California beginning in March of 2014, he was discharging his duties as

5  a direct consequence of his obedience to CSC by working closely with and reporting

6  to Mr. Pulier regarding CSC's performance pursuant to the CBA contract.  Mr.

7  Twynham's duties included working closely with Mr. Pulier, sending and receiving

8  texts and emails from Pulier, Waldron, and others, and meeting with CBA

9  Executives in Los Angeles that pertained to performance of the CBA Contract.  It

10  was because Mr. Twynham was carrying out his duties pertaining to CSC's

11  performance pursuant to the CBA Contract, and as a result of his obedience to CSC

12  pertaining to those duties, that he was accused of being involved with Mr. Pulier's

13  improper conduct and which gave rise to the expenses he incurred for which he

14  seeks reimbursement pursuant to California Labor Code section 2802.

15       32.    Based on Pulier's misconduct, several criminal investigations and civil

16  lawsuits resulted thereafter.  Again, although Mr. Twynham engaged in no

17  wrongdoing, because of the fact that Mr. Twynham worked closely with Mr. Pulier,

18  and was involved with the negotiation of, and CSC's performance pursuant to, the

19  CBA Contract, he was wrongfully accused of being involved with Pulier's

20  misconduct by CSC and the United States government.  This caused Mr. Twynham

21  to incur substantial attorneys' fees and expenses as a direct consequence of the

22  discharge of his duties with CSC and for which he seeks reimbursement pursuant to

23  California Labor Code section 2802.

24      **E.**    **United States of America v. Twynham Civil Forfeiture Lawsuit.**

25       33.    On September 2, 2015, the United States Attorney's Office in Los

26  Angeles brought a civil forfeiture action against Mr. Twynham in the United States

27  District Court, Central District of California titled *United States of America v. Real*

28  *Property Located in Brentwood, California (Twynham) and $13,271.07 Seized From*

*Premier America Credit Union Account Number XXXXXX5967*, Case No. CV 15-6794 RGK (AJWx) ("Forfeiture Action").

34.     The United States Attorney's Office claimed that Mr. Twynham purchased real property with a down payment, the majority of which was paid from funds the government alleged was traceable to the Equity Purchase Agreement payout.  The government based this civil claim against Twynham in part on the fact that Twynham worked closely with Pulier after March of 2014, when Twynham was a permanent resident of California, such as by emailing and text messaging Pulier, Waldron, and others while Twynham was a permanent resident of California.

35.     The government also seized the remaining cash that was left in Mr. Twynham's account, claiming they were likewise tainted notwithstanding the fact that Mr. Twynham had no knowledge or involvement with the Pulier and other payments at issue.

36.     Mr. Twynham's attorneys filed a motion to dismiss and served discovery responses, and the matter was stayed due to the pending criminal investigation.  Mr. Twynham was unable to sustain the cost and risk of litigation and settled the matter for $413,158.37.  The Consent Judgment which resolved the case made clear that it may not be interpreted as an admission of wrongdoing.

**FIRST CAUSE OF ACTION**
**BREACH OF CONTRACT**
**(Against Defendants CSC and DXC)**

37.     Plaintiff incorporates by reference the preceding allegations of the Complaint.

38.     Mr. Twynham and Defendants are parties to the Restricted Share Unit ("RSU") agreement attached as Exhibit 1 which is dated November 15, 2013.  Pursuant to this agreement, Mr. Twynham was awarded 19,575 Restricted Share Units ("RSUs").  These RSUs vested in thirds each year following the anniversary date of the agreement.

- 10 -

39.     Section 3(a) of the Agreement provides as follows:

If, prior to the settlement of the RSU in full:

(i) the Employee's status as an employee of the Company or any of its subsidiaries is terminated (the date of such termination, the "Employment Termination Date") . . . **by the Company <u>without Cause</u> . . . .the then unvested portion of the RSU and all related Dividend Equivalents shall vest as of the Employment Termination Date,** and the Employment Termination Date shall be considered the Vesting Date for purposes of this Agreement. As soon as practicable thereafter, the Company shall complete the settlement in full of the RSU.

(Ex. 1 at § 3(a)) (emphasis added).

40.     Appendix A to the Agreement defines "Cause" as follows:

"Cause" shall mean: (A) the commission of any material act by the Employee constituting fraud or financial dishonesty (including, without limitation, misappropriation of assets, embezzlement or similar acts) against the Company or any of its subsidiaries; (B) the Employee's conviction or plea of guilty or nolo contendere of a felony involving any criminal act or a crime of moral turpitude; (C) the Employees' substantial and willful failure to render services in accordance with the terms of the Employee's employment with the Company or any of its subsidiaries; or (D) the Employee's willful and knowing material violation of any material rules or regulations of any governmental or regulatory body that are material to the business of the Company or any of its subsidiaries.

41.     As set forth above, Twynham substantially performed all of his duties as an employee of CSC's and therefore substantially performed all of his obligations

- 11 -

under the agreement.  For example, at all times relevant to this Complaint and in each of his interactions with Servicemesh and CSC, Mr. Twynham was faithfully discharging his duties as Vice President of Emerging Markets, Vice President of Global Sales, Senior Principal: Complex Deals, or Senior Principal: Industry Strategist and following Servicemesh and CSC procedures and guidelines.

42.     Nonetheless, CSC terminated Twynham's status as an employee on July 1, 2015.  Although CSC contended otherwise, CSC's termination of Twynham was "without Cause" as that term is defined in the Agreement.  For example, in addition to the fact that Twynham did not have knowledge of Pulier's improper conduct, discussed above, Twynham certainly did not engage in any of the conduct that falls within the definition of "Cause" as set forth in the Agreement.  As a result, pursuant to section 3(a) of the Agreement, given that CSC terminated Twynham "without cause," "the then unvested portion of the RSU[s]" vested to Twynham on July 1, 2015, the date of Twynham's termination.

43.     However, in breach of the agreement, Defendants failed to provide Plaintiff with 13,050 of the 19,575 RSUs to which he was entitled.

44.     As a direct and proximate cause of Defendants breaches, Plaintiff will be damaged in an amount to be proven at trial.

## SECOND CAUSE OF ACTION
### VIOLATION OF CALIFORNIA LABOR CODE § 2802
### (Against All Defendants)

45.     Mr. Twynham repeats and realleges each of the allegations set forth above.

46.     At all times relevant to this Complaint, Mr. Twynham was an employee of Servicemesh, Inc. from February 2009 to November 13, 2013, at which time it was acquired by CSC.  CSC acquired Servicemesh and therefore assumed Servicemesh's liabilities, including its obligations to Mr. Twynham.  After the

- 12 -

1   acquisition, Mr. Twynham was an employee of CSC from November 13, 2013 to

2   July 1, 2015.

3          47.    Pursuant to California Labor Code Section 2802(a), "An employer shall

4   indemnify his or her employee for all necessary expenditures or losses incurred by

5   the employee in direct consequence of the discharge of his or her duties, or of his or

6   her obedience to the directions of the employer, even though unlawful, unless the

7   employee, at the time of obeying the directions, believed them to be unlawful."

8          48.    California employers' obligation to defend and indemnify their

9   employees is a serious one.  The California Supreme Court has explained:

10                California has a strong public policy that favors the

11                indemnification (and defense) of employees by their

12                employers for claims and liabilities resulting from the

13                employees' acts within the course and scope of their

14                employment." (Chin et al., Cal. Practice Guide:

15                Employment Litigation (The Rutter Group 2007) ¶ 3:1, p.

16                3-1 (rev. #1, 2007).) Labor Code section 2802 codifies

17                this policy and gives an employee a right to

18                indemnification from his or her employer. (See *Grissom*

19                *v. Vons Companies*, Inc. (1991) 1 Cal.App.4th 52, 59-60

20                [1 Cal. Rptr. 2d 808] [the purpose of Lab. Code, § 2802

21                is "to protect employees from suffering expenses in direct

22                consequence of doing their jobs"]; *Janken v. GM Hughes*

23                *Electronics* (1996) 46 Cal.App.4th 55, 74, fn. 24 [53 Cal.

24                Rptr. 2d 741] [Lab. Code, § 2802 "shows a legislative

25                intent that duty-related losses ultimately fall on the

26                business enterprise, not on the individual employee"].)

27   *Edwards v. Arthur Anderson LLP*, 44 Cal. 4th 937, 957 (2008).

28

49.     In fact, it is illegal for any employer to attempt to obtain a waiver of this obligation:

> Labor Code section 2804 voids any agreement to waive
> the protections of Labor Code section 2802 as against
> public policy. Labor Code section 2804 provides, "Any
> contract or agreement, express or implied, made by any
> employee to waive the benefits of this article or any part
> thereof, is null and void, and this article shall not deprive
> any employee or his personal representative of any right
> or remedy to which he is entitled under the laws of this
> State." (Italics added.) (10) Courts have interpreted Labor
> Code section 2804 to apply to Labor Code section 2802,
> making all contracts that waive an employee's right to
> indemnification null and void. (*See Liberio v. Vidal*
> (1966) 240 Cal.App.2d 273, 276, fn. 1 [49 Cal. Rptr.
> 520].) Thus, indemnity rights are nonwaivable, and any
> contract that does purport to waive an employee's
> indemnity right would be contrary to the law and
> therefore unlawful to that extent.

*Edwards v. Arthur Anderson LLP*, 44 Cal. 4th 937, 957 (2008).

50.     Mr. Twynham has incurred over one million dollars legal fees and costs in the defense and settlement of the civil forfeiture lawsuit, the related investigations, and due to discovery requests and a deposition request in the Delaware civil lawsuit filed by CSC.  These were necessary expenditures incurred as a direct consequence of the discharge of Mr. Twynham's duties for CSC and Servicemesh, and, further as a result of Mr. Twynham's obedience to the directions of CSC and Servicemesh.  That is because, as set forth in more detail above in paragraphs 10-13, 21-31, among other reasons, the expenses Mr. Twynham incurred

- 14 -

1    were the direct result of Servicemesh/CSC's direction to Mr. Twynham that he

2    negotiate the CBA Contract between September and November 2013 when he was

3    physically working in CSC's Santa Monica office, and also, and perhaps more

4    importantly, because CSC directed Mr. Twynham continued to work for Mr. Pulier

5    during the time that the improper payments were being made beginning in March of

6    2014 when Mr. Twynham was also physically working in CSC's Santa Monica

7    Office and likewise while he was a permanent resident of the State of California.

8          51.    In this regard, as set forth in more detail above in paragraphs 10-13, 21-

9    31, during the time that Mr. Twynham was a permanent resident of California

10   beginning in March of 2014, and working in CSC's Santa Monica Office, he was

11   discharging his duties as a direct consequence of his obedience to CSC by, among

12   other things, working closely with and reporting to Mr. Pulier regarding CSC's

13   performance pursuant to the CBA contract.  Mr. Twynham's duties included regular

14   meetings with Mr. Pulier, sending and receiving text messages and emails with

15   Pulier, Waldron, and others, meeting with CBA Executives in Los Angeles that

16   pertained to performance of the CBA Contract.  Mr. Twynham carried out all of

17   these duties from CSC's Santa Monica Office.  It was because Mr. Twynham was

18   carrying out his duties pertaining to the CBA Contract from the Santa Monica

19   Office, and as a result of his obedience to CSC in carrying out those duties, that he

20   was accused of being involved with Mr. Pulier's improper conduct and which

21   caused to the expenses that he incurred for which he requests indemnity in this

22   action.

23         52.    Also, Mr. Twynham's acts were not unlawful and he certainly did not

24   believe them to be unlawful.  For example, the Consent Judgment of Forfeiture in

25   the *USA v. Twynham* civil forfeiture matter indicates, "Nothing in this consent

26   judgment is intended or should be interpreted as an admission of wrongdoing by

27   Claimants Bradley Martin Lewis Twynham or Mariel Twynham, nor can this

28   consent judgment be admissible in any criminal proceeding against the Claimants to

1   prove any of the facts relied upon to establish reasonable cause for the seizure of the
2   defendant assets."

3        53.    At all times relevant to this Complaint and in each of his interactions
4   with Servicemesh and CSC, Mr. Twynham was faithfully discharging his duties as
5   Vice President of Emerging Markets, Vice President of Global Sales, Senior
6   Principal: Complex Deals, or Senior Principal: Industry Strategist and following
7   Servicemesh and CSC procedures and guidelines.

8        54.    The inclusion of Mr. Twynham as a Defendant in *United States of*
9   *America v. Real Property Located in Brentwood, California (Twynham) and*
10  *$13,271.07 Seized From Premier America Credit Union Account Number*
11  *XXXXXX5967*, Case No. CV 15-6794 RGK (AJWx), as well as the initiation of
12  criminal investigations against Mr. Twynham, were a direct consequence of his
13  employment with Servicemesh and CSC while he was working in California
14  between September and November of 2013, and also based on his involvement with
15  the CBA Contracting when he was a permanent resident of California and working
16  in CSC's Santa Monica Office beginning in March of 2014.

17       55.    Under California Labor Code § 2802, pursuant to the "strong public
18  policy" of the State of California, Servicemesh and CSC are responsible to defend
19  and indemnify Mr. Twynham for all necessary expenditures or losses incurred in
20  defending himself in the aforementioned matters.  These necessary expenditures or
21  losses include attorney's fees.

22       56.    Wherefor, Mr. Twynham has been damaged in an amount to be proven
23  at trial.

24

25

26

27

28

SECOND AMENDED COMPLAINT

## THIRD CAUSE OF ACTION
### UNFAIR COMPEITION
### IN VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS CODE § 17200, ET SEQ.
### (Against All Defendants)

57.     The preceding paragraphs of this Complaint are re-alleged and incorporated by reference as though fully set forth herein.

58.     By virtue of Defendants' aforementioned violations of the law, Defendants violated the Unfair Competition Law ("UCL"), codified at section 17200, et seq., of the California Business and Professions Code.

59.     Defendants' retained funds that should have been tendered to Mr. Twynham that were necessary to the defense and settlement of the actions against Mr. Twynham and which he incurred in direct consequence of the discharge of his duties for Servicemesh/CSC.

60.     Defendants' act of retaining funds owed to Mr. Twynham for his defense is an unlawful violation of California Labor Code § 2802 and, in the alternative, unfair as Mr. Twynham endured financial loss in the discharge of his duties to CSC.

61.     Under an equitable analysis of the facts of this case, Mr. Twynham's right to indemnity for charges related to his service to CSC is analogous to his right to the payment of his wages and constitutes equitable conversion.

62.     Plaintiff is therefore entitled to restitution in the amount of the value of these sums in an amount to be proven at trial.

1  **PRAYER FOR RELIEF**

2      WHEREFORE, Plaintiff prays to this Honorable Court for the following

3  relief:

4      1.    For general and special damages as permitted by law;

5      2.    For restitution;

6      3.    For unjust enrichment;

7      4.    Prejudgment interest to the extent allowed by law;

8      5.    Attorney's fees and costs as otherwise allowed by law; and

9      6.    For such other and further relief as the Court deems just and equitable.

10  DATED:  August 14, 2018        THE KNEAFSEY FIRM, INC.

11

12                                      */s/ Sean M. Kneafsey*
                                   By _____

13                                      Sean M. Kneafsey
                                   Attorneys for Plaintiff BRADLEY TWYNHAM

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 18 -
SECOND AMENDED COMPLAINT

**JURY TRIAL DEMAND**

Plaintiff hereby demands a trial by jury of any issue triable by right of a jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.


DATED:  August 14, 2018          THE KNEAFSEY FIRM, INC.


                                             */s/ Sean M. Kneafsey*
                                 By _____
                                            Sean M. Kneafsey
                                 Attorneys for Plaintiff BRADLEY TWYNHAM